Good morning, Your Honors. Richard Fine on behalf of the appellants. The Court is aware probably from the front page of today's Los Angeles Times. This is the first terrorist attack at an airport in the United States. The case comes here on the granting of a motion to dismiss on the judgment on the pleadings and the denial of the motion for reconsideration. The procedural aspect that we're here on, bringing it up on the denial of the motion for reconsideration as the Court has obviously read the lower court's ruling. The lower court did not take into account the fact that the FBI report was received after the Court made their decision on the motion to dismiss. And we received it before the motion for reconsideration. It was in our briefings. The Court didn't even address that. The FBI report showed that there was a showing of the casing, and that's in the FBI report, of four times at the L.L. counter, where the airport police were aware of this. It showed that they knew that someone was casing that L.L. counter. There was clearly the chance of a terrorist attack taking place there. We also had the information that came in from the report of the manual showing that the airport police were supposed to be on duty at all times, that they were supposed to have foot police visible, which they did not do. There was also the violations of the CFRs showing that they had to have somebody available for emergencies at all times. That wasn't taking place. The showing, we had the Bernard Wilson deposition that came in after the judgment and before the motion for reconsideration. The Court made a statement that we could have learned about that. That is what took place is that the city took the position that there was not a terrorist attack. They took the position, they even had an expert come in and say that there was not a terrorist attack, despite the FBI's March 23rd, 2003 report that this was a terrorist attack. There was no way that the plaintiffs would have ever known about Bernard Wilson's 2004 deposition where he not only said that this was a terrorist attack, but he also could have developed plans without the agency to foil any type of terrorist attacks. So you have all that information coming in after her judgment and before the motion of reconsideration. That is some of the basic things that we're talking about. On the other things that we have here, we have a situation of, but for the grace of God, go with you or I. Because what happens here, when we walked into this courtroom today, we went through a metal detector. If any of you or I would have been at LAX that day, we would have been killed. We're stood the chance of being killed or wounded. Jacob Avanof was killed. The difficulty is the governmental immunity. Not at all, Your Honor, and I'll tell you why. Why not? Very simply, and I'm going to take you back to a very basic concept. The basic concept comes from what is known as sovereign immunity. Sovereign immunity, if you take it nation to nation, does not exist when the nation is operating commercially, and you're aware of that. Now, what happens is that LAX is a commercial activity. No, you lost me. You're way off base. We're dealing with some statutes here. We're dealing with 815, 835, and Moncourt v. City of Los Angeles and Zellig, and you're not going to get anywhere with telling me about some foreign country operating commercially. I don't see how the Bonanno case works for you at all. Okay, I'll tell you how it works for me. Because of the fact that you have two theories that exist here. The Bonanno case is the case that distinguishes Zellig, which is your 845 type of case, and what you have a governmental immunity that is going to exist if they do nothing. And in order to do nothing, you have to have a police force or something that is involved. But what you have here is you have the other aspect. You have the aspect where they laid the airport open. And they laid the airport open by not going in and putting in the protection that they have going back and forth from September 11, 2001 onwards, where they inspect the cars coming into the airport. They didn't do that on this particular day, although they had done it before, and they do it afterwards. All that is well and good, but you have Moncourt. Okay, Moncourt is... California courts have consistently refused to characterize harmful conduct on the part of a third party as a dangerous condition in the absence of some concurrent contributing defect in the property itself. And Zellig says the same thing, and all Bonanno says is the location of public property. What's next to a hazard can be different, but that's not what we have here. Yes, you do. And you have it for the following reason, because what you're dealing with is you are dealing with as part of the location of the property, and then you come into Peterson and the other cases as what do they do as part of that location of the property, and what do you do with respect to the people that are dealing with the policies. Explain to me how Bonanno controls this case, because I can't follow it. Bonanno controls the case because of the fact that Bonanno is not just physical location, but as you read in our brief, as you take it down through the other cases, it's what they're doing with it. It is how they act with respect to the location. You go to the open gate case, I think it's the Joyce case, where they left the gate open. That's really the situation that you have here. They end up leaving the airport open because they don't have people inspecting the cars. They don't have any machines. They don't have any video equipment going. They don't go through and do the human activity that will prevent the terrorist from coming on the property. It is a fiction to sit there and think that in today's world where you have the terrorist, and this was the highest terrorist target going at that particular time, that they're going to sit there and say that they should be immune. That is a total and complete fiction when they go out and they go off over television and say that we're putting out guards at the parking lots day in and day out. And on this particular day, they didn't do it and they're saying we are immune. Remember, on this particular day, they had no one there. They had one person at a machine at the north end of the airport. They had no LAPD there because the have anyone standing around even under their own rules. And remember that the whole thing of immunity is a policy decision. They had already made the policy decision. They have it in their budget. When you read their budget, they said we've made the policy decision. We've expended $12 million on security. That decision has been made. They're out from ministerially not enforcing it. They are now doing nothing about it. That puts them into the other rules where literally they're creating a fraud upon the public. So counsel, if we decide that your case doesn't fall within Bonanno, do you lose? I think if you decide that our case, no. You go through the other parts of the statute where you come into the policy decisions and they're not going through on their ministerial aspects of the policy decisions, which I think is the 815 and the other statutes that we cite in our brief. So if you don't want to go with Bonanno, you end up in the policy decisions. And if you don't want to go on any of those things, you end up in the situation that the court down below ended up on the motion for reconsideration, not dealing with the new facts that came in. The universe of cases that discuss these statutes, is Bonanno the closest one to your situation? I think that you have Bonanno. I think that you have Joyce. You have Ogden. You have all the cases. Which one is the closest to your situation? I think Bonanno is the overall leading case from which the other cases follow. Joyce is the one that's closest. Because that's the open gate situation. And that's the one that really becomes the closest to what we have. Bonanno sets up the overall theory. Joyce is the one that comes down. Then you have Ogden, which deals with not following the ministerial acts. And you have the statutes, the 815s, the 820s, so forth. With really, once you have the policy decision made, that they didn't follow the policy decision, and you're really ending up in the fraud situation. So you liken an open gate Joyce to a failure to take all the precautions that would be necessary to keep the terrorists out. Exactly. I think you're really looking at that type of a situation because the policy's been decided here. There's no question about it. They have the $12 million that they're expending on the security and everything else. They've decided that issue. And your whole thing of immunity doesn't work because immunity only goes to the fact of a policy decision. Are you going to talk about the failure to serve the estate of the terrorists at all? I think it's fairly clear that what happens is that they did get served. And they got served afterwards. The service is in there. It's taken care of. And I think that it should be overturned. And there's really nothing. I mean, it's factually done at this particular point in time. It just didn't get done by the point in time that we ended up with the decisions where we were locked out of it. Left hand and the right hand kind of got lost. Well, with all due respect to my co-counsel, they were the ones that were handling that part of it. You thought they were doing it. They thought you were doing it. No, no. What happened is that they did it and they got it into the Orange County Register. And I don't know what happened with the Orange County Register and stuff. And finally, it did get published and it got taken care of and that was it. So I can just ask you to have that part of it reversed because the publication is in. And when you look in the district court under PACER, you'll find that it's all in there. I just ask you to reverse that part of it and get it taken care of. But that's an abuse of discretion standard, right? I think that is an abuse of discretion standard. I'm not really quite sure. I know that what we're dealing with in the main part is de novo. The other one may be abuse of discretion. I think the factual aspect of it is really a timing type of thing. And what really happened with the Orange County Register, I really don't know. They kept telling me that they had it in there and they had it in there. Was that explained to the district court? What happens is that the district court had made their order and then finally the Casio firm got the proof in. And I'm not sure what happened with the Orange County Register. Didn't get the proof back to the Casio firm or the Moreno firm in time. I'm asking was all of that explained to the district court? No, because what happened, the district court had their order. So you're asking us to do it without giving the district court the opportunity to listen to this explanation? Yes, Your Honor. I basically am. Okay, I think we understand your position. Let's hear from the appellee and then you can comment. You know, the first terrorist attack on LAX was probably Muharrem Kurbegovich in the 1970s on behalf of the Aliens of America when he blew up Pan American Airways. Your Honor, I was unaware of that and I will change my statement. It doesn't diminish at all what happened in this case. I'll change my statement then, but I believe that this was the first shooting at an airport to my knowledge. Kurbegovich used bombs, you're right about that. Minor distinction. The bottom line of it, what happened here is that because this was so close to September 11th, what really took place is that this happened and then Jerry Brown got on the radio and said, or on the TV and said, everything's all right, let's keep going and enjoy July 4th. And in the meantime, Sarah Phillips, who's here, if you read the paper this morning, you'll see what happened to her life. Avi Henn was here, has lost a daughter. The Amanoff family, you know, lost a father. I mean, it's the tragedy just went on. And the more important part of this is something very, very interesting. September 11th required special legislation to take care of these people. The people here, nothing has been done for them. Oklahoma City, there's nothing that is in place for these people either. The interesting thing, I know that that's a legislative aspect, but what happens here, and in this particular case, with the warnings that went in and everything, you are dealing with a situation that when somebody is operating, the way that this airport is operating with the warnings that are taking place, there is a way to compensate. Remember, this airport made $240 million of net profit. We understand you are going to counsel. Let's hear from the appellee, and they will give you an opportunity for rebuttal. Thank you. Good morning, Your Honors. Mr. Rodolfo Ruiz, on behalf of the City of Los Angeles, may it please the Court, responding to some of the points made, Bonanno and the other case involving the gate, Joyce, thank you, Your Honors, involved a physical aspect of the property. The open gate. The placement of the gate itself was the physical aspect of the property in combination with a dangerous condition that was adjacent. Now, under Government Code 835, as the Court is aware, you need a physical characteristic that is going to increase the danger and actually have causation, or excuse me, actually have caused the injuries that occurred. Now, the difference here, in this particular case, is that there is no physical defect in the Los Angeles International Airport that caused any of the injuries here. And that's one of the elements here. But getting to the immunity question that was also raised, this is clearly something that the legislature decided was to be taken away from judicial review and left to the executive and legislative branches to decide, how are we going to spend our limited resources for police protection? Otherwise, we're going to have courts deciding, micromanaging, if you will, all of our public areas, whether it's airports, whether it's stadiums, whether it's schools, with regards to, well, did you spend enough on metal detectors? Did you spend enough on police? That's an almost unworkable situation and not something that the courts, the courts should not be placed in that position either. Which is why 845 was passed. And the Court is correct, I don't mean to speak for the Court. It is a correct position, or the law actually is, is that when you're dealing with decisions regarding expenditure of these things, there's immunity for those decisions. You have two cases expressly on point, Munker and Zelig. Munker, in the airport situation, almost exactly on point, except it was bombs instead of guns. An open area with airport lockers, the complaint was almost exactly the same. You should have had screening, you should have had metal detectors, you should have had extra security. That didn't exist. Explicitly thrown out because of 845. Same thing with Zelig, except it's a courtroom situation, the Superior Court. Again, the same sorts of complaints. You should have had screening, you should have had metal detectors. That was also thrown out under the immunity argument. Before you even get to immunity, though, the physical defect point means that there is no liability here statutorily. There's no statute identified, which is another basis to affirm the District Court's decision and judgment. There's no physical defect, there can be no liability. And another case that I don't know was cited to the Court, let me back up. Munker and Zelig also make reference to that point. Even putting immunity aside, there's no liability here. The other case that's interesting, and I think similar, is Rodriguez v. Englewood Unified School District. This may be a case that has been found by the clerks for the Court here, but it's 186 Cal F 3rd 707. Did you cite that in your brief? No. No, Your Honor. In that particular case, similar arguments made by a plaintiff with regards to lack of screening, lack of security, except the... Was that Peterson you're talking about? No, I'm talking about a different case that was not cited. What's the name of it? Rodriguez v. Englewood Unified School District. Did you tell opposing counsel that you were going to discuss this case?  Perhaps you might want to move on to a different point. That's bad form not to advise opposing counsel. My apologies, Your Honor. Not to us, to opposing counsel. I apologize to opposing counsel. I'll withdraw the reference. But in any event, there's no liability. There's also no causation here. Where is the line to be drawn? In a lot of the cases discussed here and cited to the Court, the arguments ultimately come down to this. You can't have the public entity become essentially an insurer to prevent all crimes from occurring. And no one can necessarily foresee these types of terrible incidents that occur. So based on those holdings, I think it's absolutely correct that there's immunity and that there's no liability in this sort of a case. Do you care whether or not you prevail on the liability issue or the immunity issue? Does it matter? It doesn't matter for the ultimate outcome for the case. I think if there are going to be further appeals, I think the Court would certainly do it on both of those grounds or in the alternative. And you see that in some of the case law. I believe in both Munker and Zelich, a discussion of both issues was done. But it doesn't matter to the outcome. Technically, the case law discusses, and I believe in the Creason case, the rule stated that before you get to issues of immunity, you should evaluate liability. But other cases say in the interest of judicial economy, you can jump to immunity and decide it on that grounds first. On those grounds first. I don't know if the Court has any questions for me. I've really just summed it up. It appears not. Thank you, Your Honor. Thank you, Counsel. Rebuttal. Thank you, Your Honor. Going directly to Zelich. As the Court is aware, in Bonanno, the Court stated at page 30, California 153, in distinguishing Zelich, the Court said the Zelich plaintiffs, in contrast, were unable to point to the manner in which the physical condition of the property should have been altered to prevent the shooting. And that's where you have the relationship between Zelich and Bonanno. And in this case, we're able to show how the physical condition of the property should have been altered to prevent the shooting. So when one tries to rely on Zelich, which is many years after Moncourt, the physical condition of the property could have been altered by having the people do the inspection, by having the simple security apparatus being put in at the front door. That would have altered the physical condition of the property, and that would have prevented the shooting because he could not have gotten in. Joyce seems to require some showing of a defect in adjacent property. Is that right? Is that right? Is that right? Joyce is the open gate. It's the gate going to the other property. Remember... I know that. So it's not really... You have to show some defect in adjacent property in Joyce. In a sense, I'm not sure where you want to put the defect, whether you want to put the open gate on your property or the other property. Because you're looking... The fact that the gate was open... But Bonanno and Joyce talk about obvious defects in adjacent property, do they not? Well, Bonanno is the placement of the bus stop that it has to go over. In order to get to the bus stop, you've got to go over the other property, which is dangerous. Joyce is talking about the open gate that allows you to go in to a place where you're being dangerous. But in Bonanno, when they're distinguishing Zellig, is why there shouldn't be immunity, they say in Zellig, the reason that the plaintiffs lost in Zellig is because they were unable to point to the manner in which the physical condition of the property should have been altered to prevent the shooting. Here, we show in our interrogatory answers, how the physical condition of the property could be altered to prevent the shooting. So we're outside of what the problem was in Zellig. And I respectfully suggest to you that because we're outside of what happened in Zellig, in Zellig coming after Montcourt, that type of immunity is not going to be existing. Because the only reason that these plaintiffs were turned down in Zellig was because they couldn't show what could be done to that particular piece of property. We've shown that. We've taken care of that problem. Directly, straightforward, we said what could be done. You could have the guards there, you could have the inspections there, you could have the x-ray machines there, you could have the video equipment there. It sounds an awful lot like what they said in Zellig, that this is just a failure to provide essential police services and that's not enough. No difference, because you don't need policemen to go in and look in the trunk of a car. You don't have to have a cop to do that. Who do you need? You just have any employee to look in the trunk of a car. That's police services. No, not at all, Your Honor, because of the fact that even the TSA... So you're trying to tell me that if a government entity uses a civilian to conduct searches, that you're immune from the Fourth Amendment? The government entity, and let's use the TSA, TSA is not using policemen. They're using hired people. And you think that therefore they're immune from the Fourth Amendment, they can do anything they want? No, it's not a Fourth Amendment question. It's a question of what employee are you using. It's not a Fourth Amendment... It's a police service. It is on the so-called search that they're doing... Perform isn't going to overwhelm substance. They're performing police services. They may be performing a police service in a sense, but they do not necessarily have to use a policeman to do it. In fact, they aren't using policemen to do it. It doesn't make any difference who's doing it. Zellig talks about providing police services, and they say that's not enough to get you. No, Zellig talks about providing physical things, and what they said in Zellig is that they didn't show what physical thing was there. We showed you could have an x-ray machine there. You could use the same thing that you're using at Bloomingdale's. X-ray machines don't work without people. Dogs don't work without people. You don't need a policeman to man the x-ray machine. When you go through Bloomingdale's and you go past those two little things that tell you if you're taking something with a tag, do you need a policeman there? You don't need a policeman there, Your Honor, with all due respect. That's a difference without any meaningful legal distinction. It's not really, and I respectfully disagree with you because of the fact that what happens for the video cameras, for any of these types of things that you have, it is not necessarily a policeman that you need. You don't need the policeman to be there to have the equipment, and it's the equipment that is really dealing with these types of things. LAX right now has private security people that are watching video cameras. They have private security people sitting out there. So what it is, it is not necessarily a police type of function. Thank you, counsel. You've exceeded your time. Thank you very much. Thank you to both counsel. The case just argued is submitted for decision by the court.
judges: Trott, Rawlinson, Murguia